UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIMOLINER INC., <br>     Plaintiff/Defendant-in-Counterclaim, <br><br> vs. <br><br> DATTCO, INC., <br>     Defendant/Plaintiff-in-Counterclaim. | CIVIL ACTION NO. <br> 1:11-CV-11877-WGY |

## <u>LIMOLINER INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY REGARDING COUNT V OF ITS COMPLAINT</u>

### I. <u>Introduction</u>

The Plaintiff/Defendant-in-Counterclaim LimoLiner Inc. ("LimoLiner" and/or "Plaintiff") hereby moves this Court to enter partial summary judgment as to liability on Count V (G.L. c. 93A) of its Verified Complaint as set forth in LimoLiner's Motion For Partial Summary Judgment As To Liability Regarding Count V Of Its Complaint (the "Motion"). The Motion is based on the Defendant/Plaintiff-in-Counterclaim Dattco, Inc.'s ("Dattco" and/or "Defendant") failure to comply with the Massachusetts Motor Vehicle Regulations pursuant to 940 Code Mass. Regs. § 5.05 ("the Regulation(s)")[1], causing injury and loss to Plaintiff. The Motion is limited to violations of the Regulations as the Plaintiff reserves its right to pursue its other claims pursuant to G.L. c. 93A for other unfair or deceptive acts or practices which are based on contested facts as alleged in Plaintiff's Verified Complaint and as will be proved at trial. The underlying dispute in this matter concerns the Plaintiff's claims regarding Dattco's failure to timely and appropriately repair LimoLiner's motor vehicle as detailed in the Verified Complaint. In support of the Motion, the Plaintiff submits this memorandum.

---

[1] The Attorney General of Massachusetts has the power to promulgate the Regulations pursuant to G.L. c. 93A, § 2(c).

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law [based upon] the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...." Fed. R. Civ. P. 56(a); see Swenson v. Yellow Transp., Inc., 317 F. Supp. 2d 51, 54 (D. Mass. 2004). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarad, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324. "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

## III. Facts[2]

LimoLiner is a Massachusetts corporation that provides scheduled luxury transportation between Boston, Framingham and New York City up to five times daily, and has done so since

---

[2] The facts set forth herein are limited to those related to the Motion regarding the Defendant's violation of the Regulations. The Verified Complaint sets forth the facts concerning Plaintiff's other claims. See Exhibit B (Verified Complaint).

2

2003. See Statement of Undisputed Material Fact ("SUMF")[3] No. 1. The vehicles LimoLiner use are called Liners and are large remodeled motorcoach shells, fitted out with a range of onboard features, including kitchens, washrooms, luxury seating, satellite tracking for TV and radio, large screen televisions, 7 audio channels, 110v and 12v outlets at each seat, wireless online internet, movies, a public address system and GPS navigation. See SUMF No. 2. Dattco is a Connecticut corporation that has a service division, "Dattco Sales and Services", where it services and repairs motor vehicles, including buses and motor coaches in Randolph, Massachusetts. See SUMF No. 3.

On or about May 30, 2011, representatives of LimoLiner met with representatives of Dattco to discuss Dattco performing repairs on one of LimoLiner's Liners, identified as Liner 3001 (hereinafter the "Liner," or "3001," or "Liner 3001"). See SUMF No. 7. The Liner had been experiencing mechanical and electrical problems and had needed repairs. See SUMF No. 4. After LimoLiner inspected the Liner and performed certain work on site prior to its May 30, 2011 meeting with Dattco, it was evident to LimoLiner that certain work by an outside specialist was needed. See SUMF No. 5. This work was beyond the expertise of LimoLiner's in-house and on-site mechanics. See SUMF No. 6. Based upon Dattco's representations at the May 30, 2011 meeting, LimoLiner believed that Dattco had the expertise and availability to timely complete the necessary repairs to the Liner, including important electrical work. See SUMF No. 8. It was agreed at the May 30, 2011 meeting that Liner 3001 would be towed to Dattco's facility to be fully inspected and evaluated. See SUMF No. 9. LimoLiner requested an estimate for the repairs that were to be performed on the Liner. See SUMF No. 10.

---

[3] Record citations for the undisputed facts set forth herein are contained in LimoLiner Inc.'s Rule 56.1 Concise Statement Of Undisputed Material Facts Of Record In Support Of Its Motion For Partial Summary Judgment As To Liability Regarding Count V Of Its Complaint.

3

The Liner was in fact towed from LimoLiner's place of business in Avon, Massachusetts to Dattco's facility in nearby Randolph, Massachusetts on May 31, 2011. See SUMF No. 11. Dattco's repair records indicate Dattco first attended to the Liner on June 9, 2011 when it merely "jump started" it, and that it did not conduct its initial inspection until 10 days later on June 10, 2011, after being towed to Dattco. See SUMF Nos. 12-13. On that same day, Dattco faxed to LimoLiner a list of repairs (the "List") Dattco determined were needed for 3001 according to Dattco's inspection.[4] See SUMF No. 14; see also Exhibit E (Deposition of Michael Shaughnessy) at 71:12 – 71:17. According to Dattco's records per its Job Card, the next event regarding the Liner was Dattco again jump starting it on June 16, 2011 and then on the following day it began certain repair work. See SUMF No. 16. After the List was generated, and per the May 30, 2011 meeting, Dattco and LimoLiner had an oral discussion as to what tasks LimoLiner would perform. See SUMF No. 15.

At no time prior to charging (see below) LimoLiner for the repairs to the Liner:

- did Dattco receive any written authorization signed by LimoLiner listing the specific repairs to be performed and the total price to be paid for such repairs to the Liner, including parts and labor[5];

At no time prior to charging (see below) LimoLiner and commencing repairs to the Liner:

- did Dattco notify LimoLiner of the specific repairs to be performed on the Liner and the total price to be charged to LimoLiner for such repairs, including parts and labor, and obtain LimoLiner's authorization to perform the specific repairs[6]; or

---

[4] While it may be disputed by Dattco who generated the List and when, for the purposes of the Motion it is not material as to the issues regarding Dattco's failure to comply with the Regulations.
[5] See SUMF No. 17.
[6] See SUMF No. 17.

4

- did Dattco obtain a written waiver by LimoLiner wherein LimoLiner waived its right to know before any repairs were performed on the Liner what the repairs would be and what their cost would be. See SUMF No. 17.

Moreover, based upon a review of all the documents Dattco produced during the course of discovery the following was determined:

- At no time prior to commencing repairs on LimoLiner's Liner did Dattco record in writing the specific repairs requested by LimoLiner, or a brief description of the problems that LimoLiner encountered with the Liner which caused it to bring it to Dattco's repair shop[7];and

- Although LimoLiner, on or about June 10, 2011, provided oral authorization to Dattco to make certain repairs to the Liner, Dattco failed to maintain written records containing:
  - the date and time the authorization was received[8];
  - the name of the repair shop employee who received the oral authorization and the name of the LimoLiner employee who made such authorization[9]; and
  - the exact authorization received. See SUMF No. 18.

On August 25, 2011, Dattco faxed an invoice to LimoLiner which stated, "repair coach to run" and demanded "$10,404.00 by Bank Check only." See SUMF No. 19. LimoLiner initially decided not to pay Dattco the $10,404.00 because it determined that Dattco had not completed all of the work it promised to perform on the Liner and the Liner was not timely repaired. See SUMF No. 20. LimoLiner offered, instead, to have its counsel hold in escrow the $10,404.00 in exchange for the release of the Liner and suggested a dispute mechanism

---

[7] See SUMF No. 18.
[8] See SUMF No. 18.
[9] See SUMF No. 18.

5

agreement for the parties to quickly and economically resolve their dispute. See SUMF No. 21. Dattco refused to release the vehicle under these terms, however. See SUMF No. 22.

LimoLiner was therefore required to file suit in Norfolk Superior Court where it obtained a court order for the release of the Liner upon deposit of the $10,404.00 with the Court. See SUMF No. 23. The Plaintiff deposited said sum and the Liner was returned. See SUMF No. 24. The Defendant then removed the action to this Court.

IV. **Argument**

A. **Dattco Violated M.G.L. c. 93A**

Dattco violated Section 2(a) of G.L. c. 93A, which provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 11 extends § 2's general protection to commercial parties. See G.L. c. 93A, § 11; Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 43 (1st Cir.1995); M.G.L. c 93A, § 2(a).

To prevail on a claim under G.L. c. 93A, "a plaintiff must establish both that an unfair or deceptive act or practice has been committed and that the commission of that act or practice has caused him an injury. The plaintiff must show that there was a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." Swenson v. Yellow Transp., Inc., 317 F. Supp. 2d 51, 54 (D. Mass. 2004)(internal citations omitted).

In order to apply G.L. c. 93A, §§ 2(a) and 11 to the interaction between LimoLiner and Dattco, this Court must first determine whether the interaction is commercial in nature, and second, whether the parties were both engaged in trade or commerce and therefore acting in a business context. See Linkage Corp. v. Trustees of Boston University, 425 Mass. 1, 23-24 (1997). It is undisputed that the interactions between LimoLiner and Dattco were commercial in

nature. Both companies are for-profit businesses that did business with one another; LimoLiner hired Dattco to fix its Liner, and Dattco agreed to fix said Liner in exchange for monetary compensation.

This Court must also determine that the transaction given rise to the claim occurred primarily and substantially in the Commonwealth. See G.L. c. 93A, § 11. Here, it is uncontroverted that LimoLiner and Dattco engaged in business in the Commonwealth. On or about May 30, 2011, LimoLiner's Mr. Connolly and Mr. Shaughnessy met at the Avon, Massachusetts garage with Robert Hazel ("Hazel"), a Sales Manager and Estimator of Dattco. On May 31, 2011, the Liner was towed from Avon, Massachusetts to Dattco in Randolph, Massachusetts. The repairs that were actually performed occurred in Massachusetts, and the repairs that were supposed to be performed would have taken place in Massachusetts.

The moving party must then prove that the Defendant's conduct was, in fact, unfair or deceptive. See G.L. c. 93A, § 2. To prove that an act is unfair or deceptive, LimoLiner may show that the alleged conduct:

> *[F]ails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection....*

940 Code Mass. Regs. §. 3.16(3); J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc., 365 F. Supp. 2d 119, 145 (D. Mass. 2005)(Attorney General Regulations under c. 93A apply to Section 11 between businesses). An act that violates Section 3.16(3) is a *per se* unfair and deceptive act. See Hershenow v. Enter. Rent-A-Car Co. Of Boston, Inc., 445 Mass. 790, 797-99 (2006). In addition, however, Massachusetts courts have "consistently recognized that, to warrant an award of damages under G.L. c. 93A, there must be a causal connection between the [defendant's] deception and the [plaintiff's] loss. Hershenow v. Enter. Rent-A-Car Co. Of

7

Boston, Inc., 445 Mass. 790, 797 (2006)(internal citations omitted); J.E. Pierce Apothecary, Inc, 365 F. Supp. 2d at 148 (D. Mass. 2005)("[Plaintiff has] the burden not only of showing that acts were unfair or deceptive, but also that each individual plaintiff suffered a "loss of money or property."). Therefore, in order to be held liable for violating G.L. c. 93A, LimoLiner must also prove that Dattco's unfair and deceptive acts actually caused its loss.

The above analysis establishes that LimoLiner and Dattco were both businesses that engaged in a commercial transaction within the Commonwealth of Massachusetts. Therefore, below, LimoLiner will unequivocally show that Dattco committed unfair and deceptive acts by violating 940 Code Mass. Regs. § 5.05(2), 5.05(3) and 5.05(5) which all caused financial injuries to LimoLiner.

### B. Dattco Committed A *Per Se* Unfair And Deceptive Act Because It Violated 940 CMR 5.05(2)

Dattco committed a *per se* violation of 940 Code Mass. Regs. § 5.05(2) because it failed to comply with the requirements of this Regulation during its dealings with LimoLiner. 940 Code Mass. Regs. § 5.05(2) states as follows:

> *(2) It is an unfair or deceptive act or practice for a repair shop, prior to commencing repairs on a customer's vehicle, to fail to record in writing the following information:*
>
>> *(a) The name and address of the customer and a telephone number at which the customer may be reached;*
>> *(b) The date and approximate time the customer's vehicle was delivered to the repair shop;*
>> *(c) The year, make and registration number of the customer's vehicle;*
>> *(d) The odometer reading on the customer's vehicle; and*
>> *(e) The specific repairs requested by the customer, or, if the customer has not requested specific repairs, a brief description of the problems the customer has encountered with the vehicle which caused him to bring it to the repair shop.*

8

Section 5.05(2) applies to Dattco because it is a repair shop. See 940 Code Mass. Regs. § 5.01("Repair Shop means [any legal entity] who, for compensation, engages in the business of diagnosing or repairing malfunctions of or damage to motor vehicles, including auto body shops and retail stores which offer automotive services…"). At all material times, LimoLiner was a customer of Dattco within the meaning of this Regulation. See id. ("Customer means any [legal entity] who has repairs, service or maintenance performed or seeks to have repairs, service or maintenance performed by a repair shop on a motor vehicle.").

Dattco committed a *per se* violation of Section 5.05(2) because prior to commencing repairs on LimoLiner's Liner, it failed to record in writing the specific repairs that LimoLiner requested to be performed on the Liner or a brief description of the problems LimoLiner encountered with the Liner which caused it to bring it to Dattco's repair shop in Randolph, Massachusetts. 940 Code Mass. Regs. 5.05(2)(e). It is undisputed that Dattco began working on the Liner no earlier than June 9, 2011, even though the work (jump starting the Liner) was minimal that day, as Dattco did not inspect the Liner until June 10, 2011. According to Dattco's records, its Job Card, actual repair work began on June 17, 2011. At no time prior to June 17, 2011, (or even June 9 or 10 when Dattco jump started and conducted its initial inspection, respectively) had Dattco recorded in writing a document that complies with 940 Code Mass. Regs. 5.05(2).[10]

Dattco's *per se* unfair and deceptive act caused loss of money and property to LimoLiner. See Exhibit A (Affidavit of Fergus McCann) at 16. Specifically, LimoLiner was injured by Dattco's unfair and deceptive act because Dattco failed to clearly delineate in writing the specific repairs requested by LimoLiner which led to a dispute by the parties and monetary loss to

---

[10] This is established because Dattco, through the course of discovery, never produced a document that complies with this Regulation. See Exhibit A (Affidavit of Fergus McCann) at ¶ 9-13.

9

LimoLiner by its delay in obtaining the return of the vehicle and loss of revenues as result thereof. Even after the Liner was returned, it was not repaired as agreed and it had to be serviced by another party at substantial costs and delay. This is precisely the type of injury that is encompassed by this statute.

C. **Dattco Committed A *Per Se* Unfair And Deceptive Act Because It Violated 940 CMR 5.05(3)**

Dattco also committed a *per se* violation of 940 Code Mass. Regs. § 5.05(3) because it failed to comply with the requirements of this Regulation during its dealings with LimoLiner. 940 Code Mass. Regs. § 5.05(3) states as follows:

> *(3) It is an unfair or deceptive act or practice for a repair shop to charge a customer for any repairs on a customer's motor vehicle unless either:*
>
> > *(a) The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the total price to be paid for such repairs, including parts and labor; or*
> >
> > *(b) The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the charges for such repairs, including parts and labor, are displayed in a clear and conspicuous manner on the premises of the repair shop; or*
> >
> > *(c) If the repair shop is unable to obtain written authorization from the customer to perform specific repairs (as when the specific repairs to be performed on the vehicle are not known at the time the vehicle is delivered to the repair shop), the repair shop notifies the customer, prior to commencing any repairs, of the specific repairs to be performed on the vehicle and the total price to be charged the customer for such repairs, including parts and labor, and obtains the customer's authorization to perform such repairs; or*
> >
> > *(d) The repair shop has obtained, prior to commencing repair of the vehicle, a written waiver, in the following form, executed by the customer in a knowing, voluntary and intelligent manner:*
>
> *Waiver*

10

> *I understand that I have the right to know before authorizing any repairs what the repairs to my car will be and what their cost will be. You need not obtain approval from me for repairs or inform me prior to performing repairs what the repairs are or their cost, if the total amount for repairs does not exceed $*

This is perhaps Dattco's most egregious violation of the Regulations. Dattco committed an unfair and deceptive act or practice because at no time prior to charging LimoLiner for the repairs to the Liner:

(1)   did Dattco receive any written authorization signed by LimoLiner listing the specific repairs to be performed and the total price to be paid for such repairs to the Liner, including parts and labor;[11] or

(2)   did Dattco notify LimoLiner of the specific repairs to be performed on the Liner and the total price to be charged to LimoLiner for such repairs, including parts and labor, and obtain LimoLiner's authorization to perform specific repairs;[12] or

(3)   did Dattco obtain a written waiver by LimoLiner wherein LimoLiner waived its right to know before any repairs were performed on the Liner what the repairs would be and what their cost would be.[13]

Dattco's *per se* unfair and deceptive act caused loss of money or property to LimoLiner. See Exhibit A (Affidavit of Fergus McCann) at 16. Specifically, LimoLiner was injured by Dattco's unfair and deceptive act because Dattco failed to clearly delineate in writing the specific repairs requested by LimoLiner which led to a dispute by the parties and monetary loss to LimoLiner by its delay in obtaining the return of the Liner and Dattco's failure to repair the vehicle and loss of revenues as result thereof. Even after the Liner was returned, it was not

---

[11] See 940 Code Mass. Regs. § 5.05(3)(a)(b); Exhibit A (Affidavit of Fergus McCann) at 7.
[12] See 940 Code Mass. Regs. § 5.05(3)(a)(b); Exhibit A (Affidavit of Fergus McCann) at 8.
[13] See 940 Code Mass. Regs. § 5.05(3)(a)(b); Exhibit A (Affidavit of Fergus McCann) at 9.

11

repaired as agreed and it had to be serviced, again, by another party at a substantial cost. This is precisely the type of injury that is encompassed by this statute.

### D. Dattco Committed A *Per Se* Unfair And Deceptive Act Because It Violated 940 CMR 5.05(5)

Additionally, Dattco committed a *per se* violation of 940 Code Mass. Regs. § 5.05(5) because it failed to comply with the requirements of this Regulation during its dealings with LimoLiner. 940 Code Mass. Regs. § 5.05(5) states as follows:[14]

> *(5) It is an unfair or deceptive act or practice for a repair shop which receives any oral authorization from a customer (whether such authorization is to perform certain repairs, to proceed with repairs even at an increased cost, to extend the time during which repairs may be performed, or any other type of authorization) to fail to maintain written records containing the following information:*
>
> > *(a) The date and time the authorization was received;*
> > *(b) The name of the repair shop employee receiving the oral authorization and the name of the person making the authorization;*
> > *(c) A statement of the exact authorization received; and*
> > *(d) If the authorization was received over the telephone and the repair shop placed the call, the telephone number called.*

LimoLiner admits that on or about June 10, 2011, it gave oral permission to Dattco to perform certain repairs on the Liner. After receiving oral authorization from LimoLiner concerning the repairs to the Liner, Dattco did not maintain written records in compliance with (a) through (d) above or 940 Code Mass. Regs. § 5.05(5).[15] Based upon a review of all the documents Dattco produced during the course of discovery, Dattco specifically failed to maintain written records containing the date and time the authorization was received, the name of the repair shop employee who receive oral authorization (and the name of the LimoLiner employee who made such authorization), and the exact authorization received. Id.

---

[14] As noted above, see section II(A), Dattco is a repair shop and LimoLiner was its customer.
[15] This is established because Dattco, through the course of discovery, never produced a document that complies with this Regulation. See Exhibit A (Affidavit of Fergus McCann) at ¶ 9-13.

12

Dattco's *per se* unfair and deceptive act caused loss of money or property to LimoLiner. See Exhibit A (Affidavit of Fergus McCann) at 16. Specifically, LimoLiner was injured by Dattco's unfair and deceptive act because Dattco failed to clearly delineate in writing the specific repairs requested by LimoLiner which led to a dispute by the parties and monetary loss to LimoLiner by its delay in obtaining the return of the vehicle and loss of revenues as result thereof. This is precisely the type of injury that is encompassed by this statute.

V.  **Conclusion**

Based upon the above analysis, it is undisputed that 940 Code Mass. Regs. § 5.05 applies to Dattco's dealings with LimoLiner and its failed attempt to repair the Liner. It is further undisputed that Dattco was a repair shop and LimoLiner was its customer. Lastly, Dattco committed *per se* unfair or deceptive acts or practices by violating 940 Code Mass. Regs. § 5.05(2),(3), and (5) which caused direct loss of money or property to LimoLiner.

WHEREFORE, based upon the foregoing, the Plaintiff/Defendant-in-Counterclaim, LimoLiner, Inc. hereby respectfully requests that this Court allow its motion for partial summary judgment on Count V of its Complaint as to liability and enter judgment against Defendant, Dattco, on Count V of the Complaint as to violations of 940 Code Mass. Regs. § 5.05.

Respectfully submitted,
LimoLiner, Inc.,
Plaintiff,
By its attorney,

/s James S. Singer
James S. Singer, BBO # 464560
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA  02109
(617) 723-7700
jsinger@rflawyers.com

Date:  July 12, 2013

## CERTIFICATE OF SERVICE

I, James S. Singer, certify that on July 12, 2013, I did cause a true and correct copy of LimoLiner Inc.'s Memorandum Of Law In Support Of Its Motion for Partial Summary Judgment As To Liability Regarding Count V Of Its Complaint to be served *via* this Court's Electronic Filing ("ECF") System.

Date: July 12, 2013

By: /s James S. Singer
James S. Singer, Esq.