# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
LIMOLINER, INC.,                      )
                                      )
              Plaintiff,              )          Civil Action No. 11-11877-JCB
                                      )
v.                                    )
                                      )
DATTCO, INC.,                         )
                                      )
              Defendant.              )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

September 24, 2014

Boal, M.J.

Plaintiff LimoLiner, Inc. ("LimoLiner" or "Plaintiff") alleges that it has suffered damages from defendant Dattco, Inc.'s ("Dattco") failure to timely repair and return one of its buses. LimoLiner brought claims for breach of contract, misrepresentation, replevin, and unfair or deceptive acts or practices in violation of Chapter 93A.[1] Dattco brought counterclaims for breach of contract and quantum meruit. A bench trial was held before this Court on March 3-6, 2014.[2] For the following reasons, the Court finds in favor of LimoLiner on the breach of contract claim, in favor of Dattco on the misrepresentation, replevin and Chapter 93 claims and the quantum meruit counterclaim, and awards LimoLiner damages in the amount of $25,123.89.

_____

[1] The Complaint also contained a claim for negligence. LimoLiner voluntarily dismissed that claim in open court on March 5, 2014.

[2] All parties consented to the to the exercise of jurisdiction by a United States Magistrate Judge for all purposes and the case was reassigned to this Court on January 10, 2012. Docket No. 17.

## I.    PROCEDURAL BACKGROUND

On October 5, 2011, LimoLiner filed its complaint against Dattco in Massachusetts Superior Court.  See Docket No. 5 at 1, 12-53.  LimoLiner also filed an emergency motion for redelivery of its vehicle and preliminary relief.  Docket No. 5 at 1, 54-55.  The Massachusetts Superior Court granted the motion upon deposit of $10,404 with the Clerk's Office.  Id.

Dattco removed the case to this Court on October 24, 2011.  Docket No. 1.  On November 30, 2011, Dattco filed its answer to the complaint and a counterclaim.  Docket No. 9.  Dattco filed an amended answer and counterclaim on December 21, 2011.  Docket No. 13.

On September 30, 2013, the Court denied LimoLiner's motion for partial summary judgment and set the case for trial starting on March 3, 2014.  Docket Nos. 72, 73.

On March 3, 2014, right before the start of trial, Dattco filed a motion to amend its answer to add an affirmative defense of mitigation of damages.  Docket No. 88.  LimoLiner opposed the motion on March 6, 2014.  Docket No. 92.  The Court informed the parties at the start of trial that it would reserve ruling on this motion until the close of evidence and instructed them to present all evidence that they deemed relevant to Dattco's proposed affirmative defense.[3]

The bench trial on this matter was held on March 3-6, 2014.  LimoLiner filed Requests for Judicial Admissions and Presentation of Stipulated Facts on March 10, 2014.  Docket No. 97.

---

[3] After review of the docket in this case, it appears that Dattco's motion is unnecessary. Prior counsel for Dattco filed an amended answer on December 21, 2011, which added an affirmative defense of mitigation of damages.  Docket No. 13 at 11.  Pursuant to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure, a party may amend its pleading once as a matter of course within 21 days after serving it.  Fed. R. Civ. P. 15(a)(1)(A).  Dattco had filed and served its original answer on November 30, 2011.  Docket No. 9.  Because the amended answer was filed within the 21-day period, Dattco's amendment was permitted under Rule 15(a)(1)(A).  Accordingly, the Court denies Dattco's motion to amend the answer as moot.

The parties filed proposed findings of fact and rulings of law on March 14, 2014. Docket Nos. 98, 99.

II. ANALYSIS

    A. Findings Of Fact

    1.    Limoliner is a Massachusetts corporation that provides scheduled luxury transportation between Boston, Framingham, and New York City. LimoLiner operates "Liners," which are large remodeled motorcoach shells, fitted with a range of onboard features, including kitchens, washrooms, luxury seating, satellite tracking for TV and radio, large screen televisions, audio channels, 110v and 12v outlets at each seat, wireless internet, movies, a public address system, and GPS navigation.

    2.    Dattco is a Connecticut corporation that repairs and services motor vehicles, including buses and motor coaches, under the name of "Dattco Sales & Services."

    3.    Both LimoLiner and Dattco are engaged in trade or commerce.

    4.    At all relevant times, LimoLiner owned six Liners. On any given week, LimoLiner would generally operate five Liners, and take one out of service for repairs and maintenance. LimoLiner had in-house mechanics that performed most of their repairs and maintenance but would occasionally outsource repair work.

    5.    In or around January 2011, LimoLiner decided to sell one of its Liners, identified as Liner 3000.

    6.    Another of LimoLiner's vehicles, identified as Liner 3001, had been out of

service since approximately April 2010.[4]

7.  In or around April 2011, Stephen Connolly, LimoLiner's general manager, decided to attempt to get Liner 3001 back in service. He asked one of LimoLiner's mechanics, Michael Shaughnessy, to inspect Liner 3001 to determine what was needed in order to return it to working condition.

8.  After inspecting the vehicle, Shaughnessy told Connolly that the Liner needed extensive work. Many parts were missing and the Liner needed electrical and wiring work, among other things.

9.  Connolly testified that Shaughnessy did some repair work on Liner 3001 while Shaughnessy testified that he does not remember ever doing any repair work. In any event, in or around May 2011, LimoLiner decided to outsource the repairs.

10. On May 30, 2011, Connolly and Shaughnessy met with Robert Hazel and Chris Tinkham at LimoLiner's garage in Avon, Massachusetts.

11. At that time, Hazel was a sales manager at Dattco. Tinkham was a salesperson in training.

12. Connolly, Shaughnessy, Hazel and Tinkham took a look at the vehicle. They discussed the scope of the work. Many parts were visibly missing. For example, the ignition had been taken out. There was evidence of a fire in the electrical

---

[4] Connolly testified that he did not know when Liner 3001 went out of service. He was hired by LimoLiner in or around February 2011. Connolly testified that the last inspection report for Liner 3001 was dated November 2011 so he assumed that was the last time the Liner was used. However, an inspection report dated April 2010 indicated an odometer reading of 134,801 miles. Ex. 30. In August 2011, the odometer reading was 135,052 miles. Ex. 21. A round trip from Boston to New York is over 400 miles. Therefore, it is unlikely that LimoLiner had operated Liner 3001 after April 2010.

compartment.  Connolly, Shaughnessy and Hazel all testified that a smell consistent with burnt wiring was noticeable.  It was specifically discussed that Liner 3001 needed electrical and wiring work and that it appeared that the inverter needed repairs or replacement.

13.     Dattco agreed to repair Liner 3001 to get it back to working condition.  The parties dispute whether it was agreed that Dattco would replace or repair the inverter.  The Court finds that the parties agreed that the inverter would be replaced or repaired by Dattco.  Inverters convert power from the vehicle into 110V power.  Inverters are an important component of LimoLiner's vehicles because LimoLiner provides high-end transportation services with electric outlets at every seat.  They are also essential because they relay 110V power to many on-board features of the Liners, such as radio amplifiers, TV monitors, satellite trackers, DVD players and water pumps for the washrooms.  In addition, Hazel admitted that the inverter had been discussed as a problem that needed to be addressed in order to get the Liner back to operation.  In addition, Dattco's time sheets reflect that its mechanics performed inverter work on July 19, 2011, supporting an inference that Dattco had agreed to repair or replace the inverter, despite the fact that the inverter was not mentioned in the list of repairs referenced below.  Ex. 5.

14.     It was also agreed that Liner 3001 would be towed to Dattco's facility in Randolph, Massachusetts for inspection.  After inspection, Dattco was to provide a list of additional repairs needed and an estimate for the repairs.

15.     Connolly told Hazel that they wanted Liner 3001 to be repaired "as soon as possible." He did not, however, tell Hazel that they needed Liner 3001 by any particular date. Connolly also did not provide Hazel with any reason why it needed the Liner back as soon as possible. It was Hazel's understanding that Liner 3001 had been out of service for quite some time.

16.     Liner 3001 was towed to Dattco's facility in Randolph, Massachusetts on May 31, 2011. Dattco did not perform any work on Liner 3001 until June 9, 2011, when it "jump-started" the Liner. Ex. 4, 5.

17.     Dattco inspected Liner 3001 on June 10, 2011. Ex. 6. After inspection, Dattco generated a list of repairs for Liner 3001. Ex. 1.

18.     The list of repairs was reviewed and discussed by LimoLiner and Dattco and an agreement was reached as to what repairs Dattco would undertake to perform and what repairs LimoLiner would reserve for its own employees. Shaughnessy marked up the list, noting the responsibility of each party for each repair. Ex. 2.

19.     Dattco estimated that the needed repairs would take approximately forty hours to complete, at $85 per hour plus the cost of parts. The parties agreed that LimoLiner could provide some of the parts in order to avoid having to pay markups to Dattco.

20.     Dattco commenced work on the Liner around June 16, 2011. Ex. 4, 5. It continued to work on the Liner in June and July 2011. Id.

21.     Liner 3000 was destroyed in a fire in late June 2011. It was not until after Liner 3000 was destroyed in a fire that LimoLiner expressed an urgency in completing

the repairs to Liner 3001.

22.     On July 28, 2011, Dattco responded to an inquiry by Connolly stating that Dattco had performed approximately 62.2 hours of work on the Liner but that it would adjust the hours so that LimoLiner would not be charged for that many hours.  Ex. 10, 11.

23.     On August 3, 2011, Connolly emailed Hazel and stated, "If you get me the model number for the inverter I will contact Fleet Electrical Systems and order it."  Ex. 14.  However, on August 5, 2011, Hazel stated to Connolly that "Fleet Electrical is researching the inverter we are supposed to hear back from them today."  Ex. 15.  Later, Hazel contacted the inverter supplier and was informed that LimoLiner had cancelled an order for an inverter.  It appears that the cancellation was for an inverter for a different vehicle.  As late as August 12, 2011, Dattco was asking Connolly for help to get a response from the inverter supplier.  Ex. 22.

24.     During the time that Dattco was working on Liner 3001, Hazel told Connolly on at least three occasions that the Liner would be ready "tomorrow."  However, each time, new problems with the Liner necessitated additional work that prevented the Liner from being returned to LimoLiner.  Ex. 15.

25.     On August 4, 2011, LimoLiner's President, Fergus McCann, and Connolly met with Hazel and Jerry Taglieri, Dattco's local manager.  At the meeting, McCann wanted to know when the repairs would be completed and demanded to know how Dattco was going to compensate LimoLiner for the monetary losses it claimed it had sustained to that point.

26. On August 8, 2011, Connolly hand delivered a letter to Hazel. The letter complained that little work had been done on the vehicle. The letter also stated that Dattco had been provided with a list of repairs that LimoLiner had identified as necessary and the parties agreed that Dattco would carry them out. Connolly further stated that Dattco had estimated that the repairs required approximately 40 hours to complete, in addition to the cost of the required parts. He also stated that LimoLiner was to be advised of any additional work required to return the Liner fit for service, but he did not complain about not being advised of any additional work required. Instead, he complained about the level of attention, time and resources assigned to the job as being so limited that there was no possibility of the work being done in a timely manner. Connolly offered to settle the dispute on the terms that Dattco was to deliver the Liner fit for service by 5:00 p.m. on Friday, August 12, 2011, that Dattco would bill LimoLiner for the estimated 40 hours, plus the cost of parts for the work initially identified, plus labor and parts for additional necessary work not listed that was required. Connolly also demanded that Dattco reimburse LimoLiner for a portion of its alleged loss of revenue, namely 3 weeks of loss of use, valued at $42,000. Ex. 16.

27. On August 25, 2011, Dattco sent an email to LimoLiner advising it that Liner 3001 was ready for pickup and attached an invoice for $10,404.00. Dattco also stated that payment must be by "Bank Check only" at time of pick up and requested two hours notice to have the vehicle up and running. Ex. 18.

28. Dattco would not return Liner 3001 without payment of its invoice by bank check

and LimoLiner did not believe that it should pay for the repairs.  On September 1, 2011, LimoLiner offered to deposit $10,404.00 in its attorney's client's funds account to be held in escrow until an agreement of the parties or a court order in exchange for the return of Liner 3001 to LimoLiner.  Ex. 23.  Dattco did not agree to release the vehicle.

29.     On or about September 14, 2011, following a meeting between the parties and at the request of LimoLiner, Dattco provided LimoLiner with an estimate for repair of the inverter, replacement of batteries, troubleshooting of the 110V wiring connected to the inverter, tracing disconnected wires and accessories, reconnecting and testing accessories and checking wiring to dash systems to determine if there were any other areas of short-circuits or burned wiring.  Ex. 24, 25.

30.     Dattco returned Liner 3001 to LimoLiner on October 12, 2011, following an order by the Massachusetts Superior Court.

31.     Dattco did not replace or repair the inverter.  Following the return of Liner 3001, LimoLiner had to replace the inverter.  It took LimoLiner approximately three weeks to obtain and install an inverter.  Liner 3001 was back in service on November 11, 2011.

B.      Conclusions Of Law

1.      Breach Of Contract

In order to prove a breach of contract claim, the plaintiff must prove that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[]

sustained damages as a result of the breach." Brooks v. AIG Sunamerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (citation omitted).[5]

Here, the parties do not dispute the existence of a contract. Complaint, ¶ 34; Answer, ¶ 34. The parties dispute the scope of the contract. LimoLiner alleges that as a part of the parties' contract for repairs of Liner 3001, the parties agreed that Dattco would repair or replace the inverter. LimoLiner also alleges that the parties agreed that the repairs would be performed on an expedited basis and that LimoLiner reasonably expected that they would be completed no later than June 24, 2011. Dattco, however, disputes that it agreed to repair or replace the inverter and that it agreed to perform the repairs on an expedited basis. The Court finds against Dattco on the inverter issue and in its favor on the timing issue.

Hazel testified that Dattco was engaged to get Liner 3001 back into working condition. As set forth above, the inverter was an essential part of Liner 3001. At the May 30, 2011 meeting, it was discussed that Liner 3001 needed extensive electrical work, including the inverter. In addition, Dattco's time sheets show that Dattco performed inverter work in mid-July 2011, supporting an inference that repair and/or replacement of the inverter was a task Dattco agreed to perform. Dattco does not dispute that it did not replace the inverter. Accordingly, the Court finds that Dattco breached its agreement to repair and/or replace the inverter and that LimoLiner suffered damages, as explained in greater detail below, as a result of the breach.

The Court finds that there was no agreement that the repairs would be performed on an expedited basis. By LimoLiner's own account, all that Hazel was told was that LimoLiner wanted the Liner back "as soon as possible." In other contexts, phrases such as "as soon as

[5] There is no dispute that Massachusetts law applies.

possible" and "as soon as practicable" have been construed to mean "as soon as reasonably possible under the circumstances of the case." See, e.g., Acadia Ins. Co. v. Peerless Ins. Co., 679 F. Supp. 2d 229, 246 (D. Mass. 2010) (applying New Hampshire common law). Here, there is no evidence that LimoLiner ever told Dattco that it needed the Liner by a specific date or the reason why it needed it back as soon as possible. Liner 3001 had been sitting on the garage unused for over a year, and many of its parts had been taken to be used in other Liners. Although the parties discussed the fact that Liner 3001 needed extensive electrical work, it was not known exactly what other work Liner 3001 might need. In addition, there is evidence that once some repairs were performed, new problems were found that had to be addressed. It was not until after Liner 3000 was lost in a fire that LimoLiner expressed an urgency to have Dattco complete the repairs. Accordingly, the Court finds that Dattco did not breach the contract with regard to the timing of the repairs.

2. Misrepresentation

To prevail on a claim for either intentional or negligent misrepresentation under Massachusetts law, LimoLiner must prove that (1) Dattco made a false statement of material fact, (2) to induce LimoLiner to act thereon and (3) LimoLiner reasonably relied on the statement to its detriment. Ruggers, Inc. v. United States, 843 F. Supp. 2d 139, 145-146 (D. Mass. 2012) (citing Zimmerman v. Kent, 31 Mass. App. Ct. 72 (1991)). For an intentional misrepresentation claim, Dattco must know that its statement was false. Id. at 146 (citing Int'l Floor Crafts, Inc. v. Adams, 477 F. Supp. 2d 336, 341 (D. Mass. 2007)). For a negligent misrepresentation claim, Dattco must have made a false statement without reasonable basis for believing it was true. Id. (citing Cummings v. HPG Intern., Inc., 244 F.3d 16, 24 (1st Cir.

2001)).

Here, Limoliner alleges that Dattco made the following misrepresentations.  First, Dattco promised immediate action to repair Liner 3001, but delayed work and only worked intermittently and ineffectively.  Second, Dattco claimed that it had electrical expertise and experience and that its mechanic, Ed Corr was an electrical expert.  Third, Dattco verbally stated that the work would take forty hours.  Finally, Dattco told LimoLiner on several occasions that the repairs would be completed "tomorrow" but the repairs were not.  See Docket No. 99 at ¶ 27.

LimoLiner did not meet its burden of proof to show that Dattco promised that the work would be done immediately.  By Connolly's own account, Connolly told Dattco only that they wanted to the repairs done as soon as possible but did not give Dattco a particular date or expressed any reasons for expediting the work.  Later, Hazel provided an estimate that the work would take forty hours, but did not tell Connolly when those forty hours would take place.  LimoLiner also did not meet its burden of proof to show that it was told that Dattco had any special electrical expertise but simply that Dattco was capable of performing the repairs needed.  Shaughnessy testified that Dattco performed the repairs it agreed to do except for the inverter.  Accordingly, the Court finds that Dattco is not liable for the first two claimed misrepresentations.

The last two alleged misrepresentations are also not actionable.  False statements of "conditions to exist in the future" or "promises to perform an act" do not support a claim of misrepresentation "unless the promisor had not intention to perform the promise at the time it was made."  Ruggers, 843 F. Supp. at 146.  LimoLiner did not present any evidence that Dattco made promises without intending them to be fulfilled.  The forty hours was simply an estimate.

It was later discovered that Liner 3001 was in worse condition than everyone thought. Similarly, Dattco admits that it told LimoLiner that Liner 3001 would be ready the next day, but the evidence shows that additional problems were later discovered that prevented Dattco from fulfilling that promise. Accordingly, the Court finds that LimoLiner has failed to show that Dattco is liable for any misrepresentations to LimoLiner.

        3.     <u>Replevin</u>

A plaintiff is entitled to recover under a theory of replevin if it proves: (1) the goods in question have a value greater than twenty dollars; (2) the goods are unlawfully taken or detained; and (3) the owner or person entitled to possession is deprived of the goods. <u>Evergreen Marine Corp. v. Six Consignments of Frozen Scallops</u>, 806 F. Supp. 291, 295 (D. Mass. 1992), <u>vacated on other grounds</u>, 4 F.3d 90 (1st Cir. 1993). Plaintiff is entitled to recover damages it sustained because of the wrongful detention of the goods by the defendant, which is the value of the use of the property to the plaintiff during the time of the detention considering its nature and character. <u>Clark v. Martin</u>, 120 Mass. 543 (1876).

The Court finds that LimoLiner has failed to prove a claim of replevin because it has not shown that Liner 3001 was unlawfully taken or detained. In order to prevail on a replevin theory, "[n]ot only must the plaintiff have the right to possession generally, but he must have the right to immediate, exclusive and unqualified possession of the property as against each defendant." <u>Wilson v. Estate of Arcese</u>, No. 0701461, 2007 WL 2429607, at * 3 (Mass. Super. Aug. 9, 2007) (citation omitted). Here, LimoLiner did not have an immediate, exclusive and unqualified right to the Liner because there was a dispute regarding payment for repairs performed by Dattco. Under Massachusetts law, a repair shop has a lien upon the vehicle for

charges due for "storage, work and care of the same." M.G.L. c. 255, § 25. A repair shop with a lien may retain the vehicle until the owner dissolves the lien by posting bond or paying the amount due. See In re Henderson, No. 08-30684-HJB, 2009 WL 3348196, at *5 (Bankr. D. Mass. Oct. 15, 2009). Having performed repairs on the Liner, Dattco had a reasonable basis for keeping the Liner. LimoLiner's proposal to deposit the disputed amount in its attorney's account is not a bond and, therefore, Dattco was not required to return the vehicle at that time. Accordingly, the Court finds against LimoLiner on the replevin claim.

4.   Chapter 93A

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, §2(a). A successful claim under Chapter 93A requires a showing of (1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the plaintiff, and (3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury. Casavant v. Norwegian Cruise Line, Ltd., 76 Mass. App. Ct. 73, 76 (2009), aff'd, 460 Mass. 500 (2011) (citing G. L. c. 93A, § 9); Hershenow v. Enterprise Rent-A-Car Co. of Bos., Inc., 445 Mass. 790, 797 (2006). "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (citation omitted). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a Chapter 93A violation is a question of law." Id. at 54 (quoting Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996)).

a.      The Motor Vehicle Regulations

The Attorney General of Massachusetts is authorized to issue regulations to enforce

Chapter 93A's prohibition against unfair or deceptive acts or practices.  M.G.L. c. 93A, § 2(c);

Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 176 (1st Cir. 2004).  The Attorney General's

Regulation 3.16(3) states that a violation of "existing statutes, rules, regulations or laws, meant

for the protection of the public's health, safety or welfare promulgated by the Commonwealth or

any political subdivision thereof intended to provide the consumers of this Commonwealth

protection" constitutes a per se violation of Chapter 93A.  940 C.M.R. § 3.16(3).  Section 5.05,

in turn, regulates motor vehicle repairs and services and provides that certain practices by repair

shops are unfair or deceptive.  940 C.M.R. § 5.05.  LimoLiner alleges that Dattco violated

Section 5.05 and, therefore, engaged in unfair or deceptive acts or practices in violation of

Chapter 93A.  The Court finds, however, that Section 5.05 does not apply to business-to-

business disputes under Section 11,[6] especially where, as here, LimoLiner also repairs motor

coaches.

In Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 418 Mass. 737, 743-744 (1994), the

Massachusetts Supreme Judicial Court held that the Attorney General's regulations did not apply

to a contract dispute between businesspeople based on a breach of the implied warranty of

merchantability.  Id.  The SJC noted that it was reasonably clear that in drafting the regulations

---

[6] Sections 9 and 11 of Chapter 93A provide private causes of action for violations of
Massachusetts General Laws chapter 93A, section 2, but for different classes of plaintiffs.  A
plaintiff under Section 9 is defined as "[a]ny person, other than a person entitled to bring an
action under section eleven of this chapter."  M.G.L. c. 93A, § 9.  A plaintiff under Section 11 is
defined as "[a]ny person who engages in the conduct of any trade or commerce."  M.G.L. c.
93A, § 11.  LimoLiner is a Section 11 plaintiff.  See Complaint, ¶ 50.

at issue in that case, the Attorney General "had in mind protection for consumers against unfair or deceptive acts or practices that had come to the attention of his office in connection with shoddy repairs, inadequate and misleading service contracts and the grant of worthless warranties."  Id. at 745; see also Baker v. Goldman Sachs & Co., No. 09-10053, 2013 WL 4780962, at *4 (D. Mass. Sept. 4, 2013) (quoting a leading commentator who noted that "[t]he reasoning of the Knapp case suggests that none of the attorney general's regulations will be applied to Section 11 cases, unless and until the attorney general promulgates regulations dealing specifically with business-to-business disputes.").  Like the regulations at issue in Knapp, the motor vehicle regulations appear to protect consumers from unnecessary, shoddy or unauthorized repairs and from being overcharged for those repairs.[7]  Following the reasoning in

---

[7] Section 5.05(2)(e) provides:

(2) It is an unfair or deceptive act or practice for a repair shop, prior to commencing repairs on a customer's vehicle, to fail to record in writing the following information:
...
(e) The specific repairs requested by the customer, or, if the customer has not requested specific repairs, a brief description of the problems the customer has encountered with the vehicle which caused him to bring it to the repair shop.

940 C.M.R. § 5.05(2)(e).  Section 5.05(3) provides:

(3) It is an unfair or deceptive act or practice for a repair shop to charge a customer for any repairs on a customer's motor vehicle unless either:

(a) The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the total price to be paid for such repairs, including parts and labor; or

(b) The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the charges for such repairs, including parts and labor, are displayed in a clear and conspicuous manner on the premises of the repair shop; or

(c) If the repair shop is unable to obtain written authorization from the customer

-16-

to perform specific repairs (as when the specific repairs to be performed on the vehicle are not known at the time the vehicle is delivered to the repair shop), the repair shop notifies the customer, prior to commencing any repairs, of the specific repairs to be performed on the vehicle and the total price to be charged the customer for such repairs, including parts and labor, and obtains the customer's authorization to perform such repairs; or

(d) The repair shop has obtained, prior to commencing repair of the vehicle, a written waiver, in the following form, executed by the customer in a knowing, voluntary and intelligent manner:

Waiver

I understand that I have the right to know before authorizing any repairs what the repairs to my car will be and what their cost will be. You need not obtain approval from me for repairs or inform me prior to performing repairs what the repairs are or their cost, if the total amount for repairs does not exceed $ _____

SIGNATURE

Such waiver may be included as part of a repair order provided, however, that such waiver is printed in clear and conspicuous type and that its execution may only be accomplished by the customer's signature separate from that appearing elsewhere on the order.

(e) The provisions of 940 CMR 5.05(3) shall not be applicable if the customer brings his or her motor vehicle to the repair shop before or after its usual business hours, or, at the customer's request, repair services are rendered off the premises of the repair shop.

940 C.M.R. § 5.05(3).  Section 5.05(5) provides:

(5) It is an unfair or deceptive act or practice for a repair shop which receives any oral authorization from a customer (whether such authorization is to perform certain repairs, to proceed with repairs even at an increased cost, to extend the time during which repairs may be performed, or any other type of authorization) to fail to maintain written records containing the following information:

(a) The date and time the authorization was received;

(b) The name of the repair shop employee receiving the oral authorization and the name of the person making the authorization;

(c) A statement of the exact authorization received; and

Knapp, this Court finds that Section 5.05 was not meant to apply to transactions between businesses and businesspeople, particularly so here where LimoLiner also performed motor coach repairs as part of its business.

        b.        Chapter 93A Claims Based On Alleged
                    Misrepresentations And Breach Of Contract

In addition to the violations of the Motor Vehicle Regulations, LimoLiner alleges that Dattco violated Chapter 93A by its misrepresentations and breach of the parties' contract. Complaint at ¶ 51. Under Chapter 93A, "[c]onduct is unfair or deceptive if it 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'" Cummings, 244 F.3d at 25 (citations omitted). "The context in which the unfair act took place is of great import." Id. (citation omitted). Although an action under Chapter 93A need not articulate every element of a common law tort claim to survive, a defendant's allegedly unfair conduct "must at least come within shouting distance of some established concept of unfairness." Id. (citation omitted).

As set forth above, LimoLiner has not proven by a preponderance of the evidence that Dattco made any misrepresentations to it. There was no agreement to do the repairs on an expedited basis and Dattco's forty-hour quote was just an estimate. Although Dattco stated on several occasions that the repairs would be completed "tomorrow," new problems were found that prevented return of the Liner at that time. Accordingly, the Court finds that LimoLiner has not shown that Dattco committed unfair or deceptive practices in connection with the alleged

---

      (d) If the authorization was received over the telephone and the repair shop placed the call, the telephone number called.

940 C.M.R. § 5.05(5).

misrepresentations.

A breach of contract, without more, does not violate Chapter 93A.  <u>Massachusetts Employers Insur. Exchange v. Propac-Mass, Inc.</u>, 420 Mass. 39, 43 (1995); <u>Zabin v. Picciotto</u>, 73 Mass. App. Ct. 141, 169 (2008); <u>Pepsi-Cola Met. Bottling Co. v. Checkers, Inc.</u>, 754 F.2d 10, 18 (1st Cir. 1985); <u>Mead Corp. v. Stevens Cabinets, Inc.</u>, 938 F. Supp. 87, 91 (D. Mass. 1996). The "more" necessary to transform a breach of contract into a viable Chapter 93A claim are actions with an "extortionate quality" and must exceed "the level of mere self interest." <u>Anthony's Pier Four, Inc. v. HBC Assoc.</u>, 411 Mass. 451, 474 (1991); <u>Zabin</u>, 73 Mass. App. Ct. at 169; <u>Atkinson v. Rosenthal</u>, 33 Mass. App. Ct. 219, 226 (1992); <u>Comm. Union Ins. Co. v. Seven Provinces Insur. Co.</u>, 217 F.3d 33, 43 (1st Cir. 2000).  Here, the Court found that Dattco breached the parties' agreement by failing to repair or replace the inverter.  There has been no showing that Dattco used the contract to extort anything from LimoLiner or took any other actions that would rise to the level of conduct necessary to support a Chapter 93A violation.

5.      <u>Counterclaims</u>

Dattco brought counterclaims for breach of contract and unjust enrichment against LimoLiner.  Dattco alleges that LimoLiner breached the contract when it failed to pay for the repairs that Dattco performed on Liner 3001.  Counterclaim, ¶¶ 1-12.  In the alternative, Dattco alleges that even if there was no breach by LimoLiner, Dattco should be compensated for the repairs it performed on Liner 3001.  <u>Id.</u> at ¶¶ 13-21.

A material breach by one party excuses the other party from further performance under the contract.  <u>Lease-It, Inc. v. Mass. Port Auth.</u>, 33 Mass. App. Ct. 391, 397 (1992).  "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the

contract[].'" Id. at 396.  Once relieved from performance, the injured party is not liable for further damages incurred by the party in material breach.  Id. at 397.

Failing complete performance, however, a party "who in good faith substantially performs a contract may recover in quantum meruit."[8]  United States Steel v. M. DeMatteo Constr. Co., 315 F.3d 43, 48 (1st Cir. 2002) (quoting J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789 (1986)).  Quantum meruit is a theory of recovery, not a cause of action.  PDM Mech. Contractors, Inc. v. Suffolk Constr. Co., Inc., 35 Mass. App. Ct. 228, 231 (1993).  "Recovery under this theory is derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of the contract."  Id. (citation omitted).  In order to recover under a theory of quantum meruit, Dattco must show that (1) it conferred a reasonable benefit upon LimoLiner; (2) LimoLiner accepted the services with the reasonable expectation of compensating Dattco; and (3) Dattco provided the services with the reasonable expectation of receiving compensation.  Backman v. Smirnov, 751 F. Supp. 2d 304, 314 (D. Mass. 2010) (citation omitted).

The Court finds that Dattco conferred a benefit upon LimoLiner by performing substantial repairs on Liner 3001.  In addition, LimoLiner accepted the services with the expectation that it would pay Dattco and Dattco provided the services with the expectation of being paid for its labor and the parts provided.  Although Dattco breached the agreement by failing to repair or replace the inverter, it did perform a substantial part of the contract when it

---

[8] Dattco labeled its counterclaim as "unjust enrichment."  However, the terms "unjust enrichment" and "quantum meruit" are often used interchangeably.  Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 112 n. 26 (D. Mass. 2001); see also New England Insulation Co., Inc. v. Liberty Mut. Ins. Co., 74 Mass. App. Ct. 1102 (2009) ("[U]njust enrichment is not a separate cause of action from quantum meruit.").

performed the other repairs.  It would be unfair for Dattco not to receive any compensation for the services it did provide.  Accordingly, the Court finds in favor of Dattco on its unjust enrichment counterclaim.

6.    Damages

Having found that Dattco breached the parties' agreement because it failed to replace or repair the inverter, the Court must now determine the amount of damages due to LimoLiner from Dattco.  A wronged party is "entitled to receive the benefit of the bargain, that is, 'be placed in the same position as if the contract had been fully performed.'"  Fecteau Benefits Group, Inc. v. Knox, 72 Mass. App. Ct. 204, 208-209 (2008) (citations omitted).  Because LimoLiner had to order and replace the inverter after Liner 3001 was returned to it, it lost the use of Liner 3001 during the time that it was required to replace the inverter.[9]  Had Dattco performed the repair, LimoLiner would not have lost the use of Liner 3001 during that time.  LimoLiner's witnesses testified that it took approximately three weeks from the time it ordered the inverter to the time it

---

[9] Dattco argues that LimoLiner failed to mitigate damages because it did not pay the bill for Dattco's services received on August 25, 2011.  Had LimoLiner paid the bill at that time, it would have recovered Liner 3001 sooner and, therefore, it would have been able to put it back into service sooner.  That argument was based on LimoLiner's claim that Dattco failed to perform the repairs on an expedited basis and, therefore, it lost use of Liner 3001 for four months.  To the extent that Dattco's argument regarding mitigation of damages still applies in light of the Court's finding that it did not breach the agreement with respect to the timing of the repairs, the Court finds that LimoLiner did not fail to mitigate damages.  LimoLiner did not pay the bill because it believed Dattco had breached the agreement and no money was due. LimoLiner then proposed to deposit the disputed amount in its attorney's account until the dispute was resolved but Dattco rejected that offer.  LimoLiner's decision to then avail itself of legal remedies does not constitute a failure to mitigate.

received it and was able to install it.[10]  Accordingly, the Court finds that LimoLiner is entitled to be compensated for the three-week loss of use of Liner 3001.[11]

Both parties presented expert testimony regarding LimoLiner's damages.  That testimony was based on loss of use of Liner 3001 for approximately four months (17.6 weeks), based on LimoLiner's claim that because Dattco did not perform the repairs on a timely basis, it lost use of Liner 3001 for four months.  That testimony, however, may be used to extrapolate LimoLiner's damages for a three-week loss of use of Liner 3001.

Both experts used the same methodology to calculate damages and in many instances used the same figures and calculations.  The Court finds that Dr. Jennings's calculations are more reliable.  Dr. Jennings, LimoLiner's expert, used 2010 as a baseline for its calculations while Dattco's expert, Mr. Deiters, used both 2010 and 2012.  However, using 2012 as a benchmark is problematic because numbers for 2012 were affected by the loss of yet another Liner for the first half of the year, problems with recruiting and retaining experienced drivers, and increased competition.  In addition, Mr. Deiters reduced the calculation of damages by a factor of 50% based on the loss of Liner 3000 as a result of a fire.  Ex. 29 at 6.  Mr. Deiters

---

[10] Liner 3001 was back in service approximately four weeks after Dattco returned it to LimoLiner.  See Findings of Fact, supra, ¶ 31.  However, LimoLiner had to complete the repairs that the parties had agreed would be LimoLiner's responsibility and, therefore, Liner 3001 would not have been back in service immediately after its return in any event.  Id. at ¶ 18.  Because LimoLiner's witnesses testified that it took LimoLiner approximately three weeks to obtain and replace an inverter, the Court attributes a three-week delay and corresponding damages to Dattco's conduct.

[11] LimoLiner also may be entitled to recover the difference between the cost of replacing the inverter and what Dattco would have charged for that repair, assuming LimoLiner's cost was higher than what Dattco would have charged.  LimoLiner, however, presented no evidence regarding the cost of replacing the inverter.

believed that the loss of Liner 3000 contributed to the damages suffered by LimoLiner. However, Liner 3000 had been in the process of being sold and had Liner 3001 been ready for operation as soon as it was returned in October 2011, LimoLiner would have had 5 Liners available for operation even after losing Liner 3000.

Dr. Jennings calculated LimoLiner's damages by estimating lost revenues. He also calculated indirect costs associated with the loss of the Liner, such as having to pay for emergency charters due to breakdowns, additional road service expenses, and refunds to customers. Finally, he also calculated the direct costs savings related to the reduced number of trips and deducted that amount from LimoLiner's losses. Ex. 28.

Dr. Jennings concluded that LimoLiner lost approximately 12 one-way trips per week. Ex. 28, Attachment 1. He also concluded that the average passengers per trip were 14.8 and that the average yield per passenger trip was $80.49. Accordingly, the lost revenue from the three week loss of use of Liner 3001 is $42,885.07 (12 trips per week x 3 weeks x 14.8 passengers per trip x $80.49 average yield per passenger trip = $42,885.07).

Dr. Jennings also concluded that LimoLiner's total increased indirect costs (including contingencies, road services, and refunds) for 17.6 weeks was $59,957.81. Id. Accordingly, the Court estimates that LimoLiner experienced increased indirect costs of approximately $10,220.08 ($59,957.81 / 17.6 weeks = $3,406.69 per week; $3,406.69 x 3 weeks = $10,220.08).

Finally, Dr. Jennings concluded that LimoLiner experienced total savings of $103,119.92 as a result of reduced trips during the 17.6 weeks that it did not have use of the Liner. Id. Accordingly, the Court estimates that LimoLiner experienced direct costs savings of $17,577.26 ($103,119.92 / 17.6 weeks = $5,859.09 per week; $5,859.09 x 3 = $17,577.26).

Thus, the Court calculates LimoLiner's damages for the loss of Liner 3001 during the three weeks that it took to replace the inverter as follows:

| | |
|---|---|
| Lost Revenues | $42,885.07 |
| Plus Indirect Costs | $10,220.08 |
| Minus Direct Cost Savings | <u>$17,577.26</u> |
| Total Loss | $35,527.89 |

LimoLiner's damages, however, must also be reduced by the amount due Dattco under its quantum meruit claim. Based on the evidence presented at trial, the Court finds that the reasonable value of the services provided by Dattco is $10,404.00. Ex. 21. Accordingly, LimoLiner's total recoverable damages are $25,123.89.

III.     <u>ORDER</u>

For the foregoing reasons, the Court finds in favor of LimoLiner on the breach of contract claim, in favor of Dattco on the misrepresentation, replevin, Chapter 93A claims, and the quantum meruit counterclaim, and awards LimoLiner damages in the amount of $25,123.89.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge