**UNITED STATED DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| LIMOLINER, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| V. | ) | C.A. NO:  1:11-CV-11877-JCB |
| | ) | |
| DATTCO, INC., | ) | |
|     Defendant. | ) | |

## DATTCO, INC.'S BRIEF ON REMAND

In accordance with the joint status report filed by the parties and accepted by this Court on November 9, 2016, defendant Dattco, Inc. (hereinafter "Dattco") submits this brief.

## I.    INTRODUCTION

After a jury waived trial, this Court entered judgment in this matter on September 24, 2014.

In its Findings of Fact and Conclusions of Law, this Court found that Dattco breached its contract to repair plaintiff's Liner, for failing to repair or replace an electrical component of the vehicle (the inverter).  The court further found that there was no agreement that the repairs would be performed on an expedited basis and as such, Dattco did not breach the contract with regard to the timing of any repairs (F. 10-11).

LimoLiner failed to prove that Dattco was liable for any misrepresentations alleged to have been made (F. 11-13).  Specifically, LimoLiner did not prove: that Dattco promised the work would be done immediately; and, that Dattco represented it had any special electrical expertise (finding only that Dattco was capable of performing the repairs needed) (F. 12). LimoLiner did not appeal this finding.

LimoLiner also failed to prove its claim of replevin. This Court found that having performed repairs, Dattco had a reasonable basis for not releasing the Liner without payment and Dattco was not required to return the vehicle pursuant to LimoLiner's proposal to deposit the disputed amount in its attorney's account (F. 13-14). LimoLiner did not appeal this finding.

On the Count alleging violations of c. 93A, as a result of alleged violations of the motor vehicle regulations promulgated by the Attorney General (940 CMR 5.05), this Court found that those regulations did not apply to transactions between businesses and business people (F. 15-18).

On the Count alleging violations of c. 93A, as a result of alleged misrepresentations and breach of contract, this Court found that LimoLiner had not proven that Dattco made any misrepresentations to it. Specifically, this Court found that the repairs being done on an expedited basis was not part of any agreement and that Dattco's original 48 hour quote was just an estimate. Further, "[a]lthough Dattco stated on several occasions that the repairs would be completed "tomorrow", new problems were found that prevented the return of the Liner at that time." LimoLiner did not show that "Dattco committed unfair or deceptive acts or practices in connection with these alleged misrepresentations." The alleged misrepresentations as to the estimate of the amount of time the repairs would take, and any statements that the repairs would be completed "tomorrow" were found not actionable (F. 11-12). LimoLiner did not present any evidence that Dattco made any promises without intending them to be fulfilled (F. 12). LimoLiner did not appeal this finding.

As to the alleged breach of c. 93 as a result of the breach of contract, LimoLiner did not prove that Dattco's actions had an "extortionate quality" and exceeded "the level of mere self-interest", whereby Dattco used the contract to extort anything from LimoLiner, or took any other

actions that would rise to the level of conduct necessary to support a c. 93A violation (F. 19). LimoLiner did not appeal this finding.

Dattco prevailed on its counterclaim for unjust enrichment. In doing so, this Court found that Dattco performed "***substantial repairs***" and a "***substantial part*** of the contract when it performed the other repairs" (F. 19-21). LimoLiner did not appeal this finding.

As a result of the breach of contract, this Court found damages for lost profits for the 3 weeks it took LimoLiner to order, receive and install a new inverter, in the amount of $35,527.89 (F. 21-24).

Plaintiff appealed three of these findings to the First Circuit Court of Appeals. The challenged findings were: that the motor vehicle repair and service regulations did not apply to Dattco; that expedited performance was not part of any agreement between the parties; and, the award of damages for only 3 weeks of losses.

The First Circuit rejected LimoLiner's challenges on the issues of expedited performance and damages, upholding this Court's findings. As to the applicability of the motor vehicle repair and service regulations, the First Circuit certified this question to the Massachusetts Supreme Judicial Court.

The SJC found that the motor vehicle repair and service regulations did apply to transactions in which the customer is a business entity.

In its Judgment, entered on October 5, 2016, the First Circuit stated that since the SJC had determined that §5.05 "was intended to apply to inter-business transactions," it vacated the portion of this Court's findings that Dattco "was not subject to 940 CMR §5.05, and therefore was not liable for violations of chapter 93A…" and remanded the case for "further proceedings consistent with its opinion.

Following remand, this Court requested a Status Report from the parties, setting out the issues to be decided on remand. The parties conferred and generated a Status Report, which was filed on October 31, 2016 and accepted by the court at a hearing on November 9, 2016.

That joint status report indicated that the only issues to be determined on remand were:

1.     Whether Dattco violated the provisions of 940 CMR §5.05 with respect to the repair of Liner 3001;

2.     If Dattco did violate §5.05, whether LimoLiner suffered any loss of money or property as a result thereof;

3.     If Dattco did violate §5.05, whether Dattco's actions constituted unfair or deceptive act or practice under Mass. Gen. L. c. 93A;

4.     If Dattco did violate §5.05, whether Dattco's actions were a willful or knowing violation of Mass. Gen. L. c. 93A; and,

5.     If Dattco did violate §5.05, and its actions did constitute an unfair or deceptive act or practice under Mass. Gen. L. c. 93A, the amount of damages to which LimoLiner is entitled for any such violations, including whether it is entitled to multiple damages and attorney's fees under Mass. Gen. L. c. 93A.

It was agreed in that Status Report that if the Court found Dattco liable under c. 93A, as a result of any violations of §5.05, further evidence would be submitted to determine the amount of attorney's fees to which LimoLiner may be entitled.

The issues on remand should be limited to those listed in the Status Report and any further argument by plaintiff as to any other issue, or attempt to inject arguments outside the scope of the issues listed in the Status Report, is irrelevant to the issues to be decided, is beyond the scope of what was agreed to and was clearly waived.

In its current brief, LimoLiner asserts violations of three (3) sections/subsections of 940 CMR 5.05, specifically §§(2)(e),(3) and (5). Since the parties have agreed that the issues to be decided on remand surround only the violations of §5.05 and LimoLiner has limited its argument in the brief to the 3 sections noted, the scope of the Court's decision should be limited to deciding

the issues laid out in the status report, with respect to §5.05(2)(e),(3) and (5). Any further argument by plaintiff as to any other issue is irrelevant to the issues to be decided, is beyond the scope of what was agreed to and was clearly waived.

## II.     RELEVANT FACTS AND FINDINGS

In addition to the findings set forth in the introduction section of this brief, Dattco asserts the following relevant facts and findings.

The vehicle at issue (Liner 3001) that had been out of service since approximately April of 2010 (F. 3-4, ¶6). It had been sitting in the garage, unused for over a year and had been cannibalized for parts (F. 11).

In April of 2011, LimoLiner decided to try to get Liner 3001 back in service (F. 4, ¶7). A LimoLiner mechanic inspected the Liner, to see what needed to be done to return it to working condition (F. 4, ¶7). The mechanic determined that the Liner needed extensive work (F. 4, ¶8). It had many parts that were missing and it required electrical and wiring work, among other things (F. 4, ¶8). In May of 2011, LimoLiner decided to outsource the repairs (F. 4, ¶9). LimoLiner did not have Dattco come in to look at the vehicle until May 30, 2011 (F. 4, ¶¶ 8-10).

When Dattco representatives looked at the vehicle, while it was still on LimoLiner's property, the parties discussed the scope of work (F. 4, ¶12). Many parts were visibly missing and the ignition had been removed (F. 4, ¶12). There was evidence of a fire in the electrical compartment and all present testified that a burnt wiring smell was noticeable (F. 4-5, ¶12). They specifically discussed that the Liner needed electrical and wiring work and that it appeared that the inverter needed repairs or replacement (F. 5, ¶12; F. 10). Although it was discussed that the Liner needed extensive electrical work, it was not known exactly what other work it might need (F. 11). The Liner could not be started and had to be towed to Dattco (F. 5, ¶14; 6, ¶16).

The inverter is a part of the electrical system, converting power from the vehicle into 110V power for use in the Liner, including power to many onboard features (F. 5, ¶13).

As a result of the initial meeting, the parties agreed that the Liner would be towed to Dattco for inspection, in order to generate a list of additional repairs needed and an estimate of the repairs (F. 5, ¶14). While LimoLiner wanted the Liner back "as soon as possible", it did not tell Dattco that it was needed by any particular date, and did not provide Dattco with any reason why it needed it back as soon as possible (F. 6, ¶15). Dattco understood that the Liner had been out of service for quite some time (F. 6, ¶15).

The Liner was towed to Dattco on May 31, 2011 (F. 6, ¶16). When Dattco first performed work on the Liner, it had to be jumpstarted (F. 6, ¶16).

Dattco inspected the Liner and generated a "list of repairs" (F. 6, ¶17). The list was discussed between the parties and they agreed who would do each of the items on the list (F. 6, ¶18). It is not disputed that this agreed list did not contain the word "inverter." However, the list did contain many items that are more akin to symptoms of problems, rather than specific repairs. (LimoLiner's Trial Exhibit Appendix, E. 3, 7 and 11).

Dattco estimated that the repairs would take approximately 40 hours, at a rate of $85 per hour plus the cost of parts (F. 6, ¶19). It was agreed that LimoLiner could provide parts in order to avoid having to pay markups on those parts (F. 6, ¶19). Dattco began work on the Liner around June 16, 2011 and continued to do work in June and July 2011 (F. 6, ¶20). This Court found that there was evidence that once some repairs were performed, new problems were found that needed to be addressed (F. 11).

Dattco's timesheets showed that Dattco performed work on the inverter in mid July 2011 (F. 10; LimoLiner's Trial Exhibit Appendix, E. 19). According to this Court, this evidence

supported the inference that repair and/or replacement of the inverter was part of the agreement (F. 10). On August 3, 2011 the parties exchanged e-mails seeking the inverter model number, so Dattco could order a new inverter (F. 7, ¶23). On August 5, 2011, Dattco informed LimoLiner that the inverter vendor was researching the inverter and expected a response that day (F. 7, ¶23). Later, Dattco was told by the inverter supplier that LimoLiner had canceled in order for an inverter (F. 7, ¶23). As late as August 12, 2011, Dattco was seeking help from LimoLiner in getting a response from the inverter vendor (F. 7, ¶23). This evidence clearly shows that Dattco was engaged in doing work with respect to the inverter during the course of this contract.

During the course of the work, Dattco informed LimoLiner on at least 3 occasions that the Liner would be ready "tomorrow", however, each time new problems arose which required additional work that prevented its return to LimoLiner (F. 7, ¶24; F 18).

On August 4, 2011, the parties met and LimoLiner's principal asked when the repairs would be completed and "demanded to know how Dattco was going to compensate LimoLiner for the monetary losses it claimed it had sustained to that point" (F. 7, ¶25).

On August 8, 2011, LimoLiner hand-delivered a letter to Dattco, complaining that little work had been done on the vehicle (F. 8, ¶26). That letter indicated that Dattco had been provided with a list of repairs that LimoLiner had identified as necessary and that Dattco would carry out (F. 8, ¶26). While LimoLiner said it was to be advised of any additional work required to return the Liner to service (beyond that which was on the agreed list), it did not complain about not being advised of any additional work required (F. 8, ¶26). Instead, the complaint surrounded the level of attention, time and resources assigned to the job (F. 8, ¶26). In the letter, LimoLiner offered to resolve the dispute, provided that Dattco would deliver the Liner, fit for service, 4 days later (August 12, 2011), that Dattco would bill LimoLiner for the original

estimate, plus costs for the parts for the work initially identified, as well as labor and parts for additional necessary work not listed, that was required (F. 8, ¶26). LimoLiner also demanded payment of a portion of its loss of revenue for three weeks of lost use, which it valued at $42,000 (F. 8, ¶26).

On August 25, 2011, Dattco e-mailed LimoLiner, advising it that the Liner was ready for pickup and attach an invoice for $10,404 (F. 8, ¶27).

Following return of the Liner, it took LimoLiner approximately three weeks to obtain and install an inverter (F. 9, ¶31). LimoLiner's mechanic admitted that Dattco performed all of the repairs it agreed to do, except the inverter (F. 12).

## III.  DATTCO DID NOT VIOLATE 940 CMR §5.05 (2)(e)

940 CMR §5.05(2)(e) provides:

"It is an unfair or deceptive act or practice for a repair shop, prior to commencing repairs on a customer's vehicle, to fail to record in writing the following information:

(e)  the specific repairs requested by the customer, or, if the customer has not requested specific repairs, a brief description of the problems the customer has encountered with the vehicle which caused him to bring it to the repair shop."

This is a recordkeeping statute. It does not require that any such writing be shared with the customer, or any of the items on the writing be authorized by the customer, or that the customer sign any such writing. It simply requires that the information be recorded.

Dattco asserts that the evidence shows that it complied, or at a minimum, substantially complied with the regulation and as a result, it cannot be found to have violated the regulation, as a "brief description of the problems [LimoLiner] encountered with the vehicle, "which caused [it] to bring it to the repair shop" was in fact recorded in writing so as to satisfy the regulation.

The "list of repairs" is really a misnomer, as this document is more accurately a brief description of the problems with the vehicle which caused it to be brought to the repair shop. In

fact, that's really the history of how this list was generated. LimoLiner asked a Dattco sales person to come look at the vehicle and described a lot of the issues, both general and specific, to him. Despite this, no work was going to be done until a list of problems/repairs was generated and agreed to.

In the list, many of the entries are in fact descriptions of problems that were found and not necessarily specific repairs. Specifically, after the section entitled "body", it begins with "not charging", which is not a specific repair, but a symptom or problem. The same would be true with "no interior lights", "not building air", "[instrument] cluster not working", "outside docking lights inoperable", "engine warning light", "no Turbo boost", "staying in low ride", "air leak" and "oil from air dryer." In other words, these are symptoms encountered or conditions found, based on the inspection of the Liner and not specific repairs. In fact, it was the purpose of this engagement to investigate these symptoms encountered and conditions found to determine what was causing them, so specific repairs could be made. This list also shows that the parties understood that there were electrical problems with the vehicle, as it wasn't charging and there were no interior lights or exterior docking lights. In fact, LimoLiner's mechanic, Michael Shaughnessy, called it a "list of problems" (See LimoLiner's Trial Transcript Appendix, T. 155, L. 22-24).

While the parties were both involved in coming up with this list and neither wrote the specific word "inverter" on the list, it is clear from this Court's findings that all understood from the outset that there were electrical problems that needed to be repaired, which also included the inverter. In fact, this Court specifically found that the inverter appeared to have been affected by fire and was discussed. The fact that electrical problems are described in the list that was generated, as part of "a brief description of the problems the customer has encountered with the

vehicle which caused [it] to bring it to the repair shop", combined with the fact that the court has found that the inverter was part of the electrical system, makes this list compliant with this specific subsection of the regulation.

Further, there's nothing in the subsection to indicate that Dattco had to do anything other than record the specific repairs or complaints, as there is no requirement that the parties exchange any such list, agree to anything documented on the list, or, that anything on or not on the list limits any ability of the parties to identify and/or deal with problems not on the list.

## IV.     DATTCO DID NOT VIOLATE 940 CMR 5.05(3)

940 CMR 5.05(3) provides:

"(3)     It is an unfair or deceptive act or practice for a repair shop to charge a customer for any repairs on a customer's motor vehicle unless either:

(a)     The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the total price to be paid for such repairs, including parts and labor; or

(b)     The repair shop has received written authorization signed by the customer listing the specific repairs to be performed and the charges for such repairs, including parts and labor, are displayed in a clear and conspicuous manner on the premises of the repair shop; or

(c)     If the repair shop is unable to obtain written authorization from the customer to perform specific repairs (as when the specific repairs to be performed on the vehicle are not known at the time the vehicle is delivered to the repair shop), the repair shop notifies the customer, prior to commencing any repairs, of the specific repairs to be performed on the vehicle and the total price to be charged the customer for such repairs, including parts and labor, and obtains the customer's authorization to perform such repairs; or

(d)     The repair shop has obtained, prior to commencing repair of the vehicle, a written waiver, in the following form, executed by the customer in a knowing, voluntary and intelligent manner:…"

If Dattco is found to have complied with any one of the subsections (a-d), it has complied with §3, based on the use of the word "or" at the end of each subsection.

While it could be argued that Dattco did receive "written authorization from the customer" with respect to subsections (a) and (b), based on communications between the parties in agreeing to the list, Dattco did comply, or at a minimum, substantially comply, with Subsection (c), which does not require a written authorization.

The agreed list is the notification to LimoLiner of specific repairs to be performed, as well as general areas and problems to be investigated, although such a list is not a requirement of this subsection. This list was discussed and agreed to. There also is no dispute that Dattco provided LimoLiner with an estimate of the amount and cost of labor time and LimoLiner authorized the work to proceed. There's further evidence that the parties understood that although the specific word "inverter" was not on the list, the inverter needed to be addressed(See LimoLiner's Trial Transcript Appendix, T. 156, L. 18-24).

A written list, such as the one generated, is not a requirement of the statute and the evidence clearly shows that everyone understood the nature and extent of the work to be done and the estimated time/cost. It's also clear that in authorizing the work at the outset, LimoLiner expected the inverter to be part of that work (See LimoLiner's Trial Transcript Appendix, T. 155, L. 22-24). As such, Dattco complied with, or, substantially complied with and did not violate §5.05 (3).

## V.       DATTCO DID NOT VIOLATE 940 CMR §5.05(5)

940 CMR 5.05(5) provides:

"(5)     It is an unfair or deceptive act or practice for a repair shop which receives any oral authorization from a customer (whether such authorization is to perform certain repairs, to proceed with repairs even at an increased cost, to extend the time during which repairs may be performed, or any other type of authorization) to fail to maintain written records containing the following information:

(a)      The date and time the authorization was received;

11

(b)     The name of the repair shop employee receiving the oral authorization and the name of the person making the authorization;

(c)     A statement of the exact authorization received; and

(d)     If the authorization was received over the telephone and the repair shop placed the call, the telephone number called."

This Section only requires that Dattco keep records of any type of oral authorizations from a customer.  If there were no such oral authorizations (as LimoLiner alleges), there would be no requirement to keep any such records.

LimoLiner seems to limit its argument to the lack of any authorization to extend the time during which repairs may be performed.  However, again, this Section does not require there to be any such authorization.  It only requires that Dattco keep records of any such authorization, if one is made.  It also does not in any way require that any such authorization be sought, or occur prior to any work beginning.  In fact, it would be Dattco's position that if there was any such authorization given by LimoLiner, it can be found in the agreed list and in LimoLiner's letter of August 8, 2011, in which LimoLiner specifically agreed to pay for the work originally identified (in the agreed list), plus parts, as well as labor and parts for any additional necessary work not listed, that was required.  LimoLiner cannot now seriously argue that it did not authorize any work it agreed to pay for in this letter.  Dattco maintained a copy of this letter and the letter clearly states all of the information required by this Section.

Having complied, or substantially complied with all of the regulations, there can be no finding of a violation and thus, no violation of c. 93A and the court should enter judgment on those claims, in favor of the Dattco.

## VI.     LIMOLINER CANNOT SHOW A LOSS OF MONEY OR PROPERTY AS A RESULT OF ANY VIOLATION OF 940 CMR 5.05(2)(e), (3) or (5)

If the Court finds that Dattco violated one or more subsections of §5.05, although the regulation makes any such violation an unfair or deceptive act or practice, LimoLiner must prove that it suffered a "loss of money or property, real or personal, as a result of the use or employment of any such unfair or deceptive act or practice."  G.L. c. 93A, §11.  Specifically, LimoLiner must show a causal connection between the violation of the regulation and the alleged injury.  See *Casavant v. Norwegian Cruise Line, Ltd.*,76 Mass.App.Ct. 76 (2009), aff'd 460 Mass. 500 (2011).  This "causal connection" requires proof that the violation of any regulation was both a "but for" cause (cause-in-fact) and a legal cause of the harm for which it seeks a remedy.  *RLI Ins. Co. v. General Star Indem. Co.*, 997 F.Supp. 140 (D.Mass.1998) citing *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841 (1983).

LimoLiner cannot prove either "but for" or proximate causation with respect to its claim that it suffered any loss as a result of any violation of section 5.05(2)(e).  The only discussion of any such alleged causal link is in footnote 6 of its brief, where it states, that "certainly the damage resulting from Dattco's failure to repair or replace the inverter is directly and causally connected to Dattco's failure to record the inverter work prior to commencing repairs."  This is the only mention of any alleged causation between any loss and this particular subsection anywhere in the brief and again, no evidence in the record is provided to support this allegation.

This Court has already found that the repair or replacement of the inverter was part of the contract.  Additionally, the court found that Dattco was working on the inverter issue as of July and continued to work on the inverter issue into August.  Although the specific word "inverter" was not on the list that was generated and agreed to by the parties, it was clearly something the parties were aware of and was being worked on during the course of the contract.

13

As such, LimoLiner cannot even show "but for" causation, as inverter work was in fact going on for some time prior to the alleged breach (assuming the alleged breach is the issuance of the invoice on August 25th). The evidence does not show that "but for" the failure to write the word "inverter" on the list (which is plaintiff's argument as to violation of §5.05 (2) (e)), the breach would not have occurred, or that LimoLiner would not have suffered any loss of money or property.

As such, LimoLiner cannot carry its burden in proving that any alleged violation of §5.05(2)(e) (by not writing "inverter" on the agreed list), caused Dattco to breach the agreement, or in any way caused LimoLiner to have suffered any loss of money or property.. The Court should find in favor of Dattco on this issue.

LimoLiner also cannot show either "but for" or proximate causation with respect to its claim that it suffered any loss of money or property as a result of any alleged violation of §5.05(5).

LimoLiner claims that the time for repairs was extended on at least 3 occasions, and as a result, Dattco was required, under §5.05(5), to document whether LimoLiner had authorized the delays. That is a complete misrepresentation of what the specific subsections says. §5.05(5) only requires the recording of information regarding oral authorizations (if received) and does not require any such authorization be sought at any time, nor does it require that any such authorization be obtained prior to commencing any work. As argued earlier, Dattco asserts that LimoLiner's letter of August 8, 2011 satisfies all requirements of documentation required under §5.05(5).

LimoLiner again offers no facts to support any causation between this alleged failure to keep records of oral authorizations and any loss it may have sustained (as a result of failing to

14

record any verbal authorizations). In fact, its own argument (that there are no such authorization) defeats it argument as to having to keep records (as if there is no verbal authorization, there is no requirement to keep records). Instead, it baldly states that if such records existed, this somehow would have eliminated any question about the timing of the repairs and would have minimized any unwarranted delays that somehow resulted in the loss of use by LimoLiner. Despite the fact that this is irrelevant, since the court found that expedited performance was not part of the agreement between the parties, as well as the fact that the subsection does not require any such authorization prior to work being performed, LimoLiner offers no support in the evidence for this assertion and as such, it has no merit and cannot be sustained.

LimoLiner cannot show either "but for" or proximate causation with respect to its claim that it suffered any loss of money or property as a result of any violation of §5.05(3).

As mentioned earlier, 940 CMR 5.05(3) requires, absent a written authorization, that Dattco notify LimoLiner, "prior to commencing any repairs, of the specific repairs to be performed on the vehicle and the total price to be charged the customer for such repairs, including parts and labor, and obtains the customer's authorization to perform such repairs." Dattco would rely on its earlier argument that it complied with this subsection.

Dattco relies on the same argument as to causation. The real issue here is over the failure to list "inverter" on the agreed list. Dattco clearly had authorization to perform repairs according to the list and, despite the fact that it was not specifically noted on the list, to repair or replace the inverter, as LimoLiner clearly expected it to do so. This Court in fact found that Dattco did work on the inverter during the course of this contract. As such, it cannot be said that "but for" the failure to list "inverter" on the list agreed to by the parties, as well as the failure to obtain a

specific authorization for such repair or replacement of the inverter, the breach would not have occurred and plaintiff would not have suffered injury. While this arguably might have some merit if Dattco did not work on the inverter during the course of this contract, any such argument without support in the evidence is absurd and the court should reject this argument and find in favor of Dattco on this issue.

Finally, it bears noting that the court's own decision on the breach of contract action supports a finding of no causation based on any alleged violation of the regulation. This Court found that a contract existed between the parties that included repair or replacement of the inverter, despite the fact that the agreed list did not contain the word "inverter." Implicitly, the court found this failure to be irrelevant, as the parties conduct and other facts established that repair or replacement of the inverter was part of the contract and in fact, Dattco was working on the inverter in July and August of 2011. As such, this Court's own finding as to the contract claim contradicts and vitiates LimoLiner's argument that any failure to record information, particularly the word "inverter" on the agreed list, or any other failure to keep or record information, caused it any loss of money or property. As such, the court should find LimoLiner cannot establish causation, in any form, between Dattco's violation of any regulation and any alleged damage sustained by LimoLiner and find for Dattco on these claims.

## VI. THIS COURT SHOULD NOT CONSIDER THE "TOTALITY OF CIRCUMSTANCES" AND TAKE A SECOND LOOK AT ISSUES ALREADY DECIDED AND EITHER NOT APPEALED, OR DECIDED AGAINST LIMOLINER ON APPEAL

LimoLiner makes the argument that when this Court made its original ruling, the "totality of the circumstances it presumably considered did not include the fact that Dattco violated any of the [regulations]." LimoLiner goes on to assert that this Court must now take a second look at its claims that the breach of contract and misrepresentations (despite the fact that this Court found

no actionable misrepresentations) amounted to an unfair or deceptive act or practice, presumably to determine if those findings should be overturned. It offers no support for this.

LimoLiner had the opportunity to appeal this Court's finding of no c. 93A liability as a result of the breach of contract and as to the misrepresentation count, or on the finding of no actionable misrepresentation, but chose not to do so. As such, any argument as to altering, amending or overturning that part of this Court's findings is foreclosed and should not be addressed. As stated earlier, the issues on remand are well defined and limited to the issues agreed to in the Status Report. Any attempt to get this court to review any decision that was either not appealed, or decided against LimoLiner on appeal, is improper and should be not considered.

LimoLiner goes on to argue that "false assurances about the timeliness of the repair work and the level of expertise of Dattco staff" were both sufficiently unfair and deceptive to violate Chapter 93A. Again, this Court specifically found that there was no such misrepresentation as to these issues and no violation of c. 93A. Plaintiff did not appeal this issue and as a result, it is waived. Thus, any attempt by LimoLiner to have this court revisit the issue of misrepresentation is improper and should not be considered.

LimoLiner also appears to also want to reargue (and have this Court reopen) the issue of whether expedited repairs were part of the agreement between the parties. LimoLiner appears to be asking this Court to look at this particular issue again, simply because the First Circuit reversed this court's finding with respect to the applicability of the regulations. This has already been decided by this Court and that finding was not appealed by LimoLiner. As such, any revisitation of this issue is improper and should not be considered by this Court.

LimoLiner is incorrect in asserting that the court must consider all of the circumstances (in order to revisit the findings already made by this Court with respect to timeliness of the repairs and any alleged misrepresentation as to specialized expertise in electrical work), which this Court found LimoLiner had not proven, and to determine the full extent of any unfair or deceptive act or practice is beyond those that may arise from any violation(s) of the regulation(s). LimoLiner has offered no legal basis for such an assertion and this remand is and should be limited to the issues set forth, at most, in the Status Report, which surround issues of whether Dattco violated the regulation, whether LimoLiner suffered any damage as a result of any violation (causation) and the issues of multiple damages and attorneys' fees for any such alleged violations. The other issues raised by LimoLiner are spurious and should not be considered as not part of this remand.

## VII.    DAMAGES/MULTIPLE DAMAGES

Plaintiff asserts that when the factual basis for a c. 93A claim is the same as that of an underlying common law claim, the measure of damages for each claim may also be the same.

The factual basis for any c. 93A claim arising from any violation of the regulation at issue herein does not share the same factual basis as the only claim for which Dattco was found liable, that being the breach of contract. In that instance, Dattco relies on the argument it made with respect to causation, in that this Court's own finding on the contract issue shows that any damages suffered by the plaintiff arose out of the breach of contract and not any failure to record the word "inverter" on the agreed list, or any other failure to retain documents or record information.

Should the court find that Dattco violated one or more section or subsections of the regulation and further finds that the plaintiff suffered a loss of money or property as a result of

this violation, the proper measure of damages in this case is the loss of money or property the court finds causally related to any violations of the regulation. See ***Multi Technology, Inc. v. Mitchell Mgmt. Sys., Inc.***, 25 Mass.App.Ct. 333 (1988).

Dattco asserts that the measure of damages in this situation would be only those damages which the court might find attributable to Dattco's failure to record information as required under those regulations and that this number is zero. This is because the factual bases for these claims are different than the only claim on which this court found defendant liable, for breach of contract. It is Dattco's position that plaintiff cannot prove any damages arising, on a "but for" or proximate causation basis, arising from any breach of a regulation.

The breach of contract claim arose from the fact that the Court found that the parties had an agreement that included the repair or replacement of the inverter. The Court found a simple breach of contract and awarded damages for the amount of time LimoLiner was required to keep the Liner out of service while it ordered and installed the inverter. It found against LimoLiner on all other Counts. This finding was implicitly not based on whether Dattco recorded the words "inverter" on any document, or, whether it received any authorization from the plaintiff (or recorded any such information or authorization). As such, Dattco asserts that if the court finds it liable in this instance, it is well within the courts purview to award no damages.

Dattco asserts, that even if the court should find Dattco breached a particular regulation and that there was a causal connection between that breach and some damages suffered by the plaintiff (the breach of contract damages), LimoLiner's recovery would be limited to the judgment for breach of warranty, absent any showing of a willful or knowing violation.

Dattco further asserts that even if the court were to find Dattco breached a particular regulation that there was a causal connection between the breach and some damages suffered by

the plaintiff, no such findings should be subject to doubling or trebling. This Court's own findings make clear it did not find that Dattco engaged in any type of conduct considered egregious or unethical, that would give rise to a finding of willful or knowing violation of the regulations. Massachusetts courts have always treated claims under c. 93A, §11 differently than consumer claims under §9. Such actions must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *St. Paul fire and Marine Ins. Co. v. Ellis & Ellis*, 262 F.3d 53 (1st Cir. 2001), citing *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 213 F.3d 33, 40 (1st Cir. 2000).

There is nothing in the court's findings or the evidence adduced at trial to suggest that any conduct on the part of Dattco would rise to the level required to merit multiplication of damages. As such, this court should not multiply damages.

Finally, Dattco asserts that if the court finds that Dattco did not breach any of the sections/subsections of the regulation, or, that its breach was not causally related to any alleged damages of the plaintiff, or, that the plaintiff sustained no damages, there can be no award for attorney's fees.

## VIII. CONCLUSION

For the reasons stated herein, Dattco request that this court fight in its favor on plaintiff's claim for violations of c. 93A, §11, as a result of violations of 940 CMR 5.05(2)(e), (3) and (5).

Defendant,
By its attorneys,
WILLIAMS & ASSOCIATES

/s/ Christopher S. Williams
Christopher S. Williams (BBO# 528465)
685 Centre Street, Suite 208
Boston, MA 02130
(617) 303-0909
Fax: (617) 723-3355
cwilliams@williams-lawyers.com

**CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants has identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 8, 2017.

/s/ Christopher S. Williams
Christopher S. Williams (BBO# 528465)